## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Justin J. Dekker; and
Michelle K. Dekker,

        Plaintiffs,

v.

Cenlar FSB; and
CitiMortgage, Inc.,

        Defendants.

Case No. 21-cv-0162 (MJD/TNL)

**SECOND SUPPLEMENTAL
COMPLAINT WITH
JURY TRIAL DEMAND
SEEKING DAMAGES**

## PRELIMINARY STATEMENT

1.    This action for damages and declaratory relief is based on Defendants' pattern and practice of: leaving Plaintiffs in limbo by repeatedly failing to act on Plaintiffs' loss mitigation applications, neither denying nor timely approving them; "dual tracking" by simultaneously pursuing foreclosure while Plaintiffs' loss mitigation applications were pending; illegally threatening foreclosure; and unjustifiably hindering Plaintiffs from performing under the original mortgage loan agreement.

2.    In enacting the dual tracking prohibitions in Regulation X, the Consumer Financial Protection Bureau recognized that "the potential harm to consumers of commencing a foreclosure proceeding before the consumer has had a reasonable opportunity to submit a loss mitigation application or while a complete loss mitigation application is pending is substantial." Federal Register /Vol. 78, No. 31 /Thursday, February 14, 2013 /Rules and Regulations 10819.

3.    The CFPB recognized that harms to borrows from dual tracking include "confusion

       from receiving inconsistent and confusing foreclosure communications, while loss

       mitigation reviews are ongoing. … Further, borrowers may be negatively impacted

       because borrowers are responsible for accruing foreclosure costs while an

       application for a loss mitigation option is under review.  These costs burden already

       struggling borrowers and may impact the evaluation and ultimate outcome for a

       borrower for a loss mitigation option."  Federal Register /Vol. 78, No. 31 /Thursday,

       February 14, 2013 /Rules and Regulations 10819.

4.    The CFPB noted in 2013 that anecdotal evidence of the prevalence of dual-tracking

       abuses by servicers was accumulating.  Federal Register /Vol. 78, No. 31 /Thursday,

       February 14, 2013 /Rules and Regulations 10815 n.169.

5.    The anti-dual tracking regulation "is necessary and appropriate to carry out the

       purpose under section 1021(a) of the Dodd-Frank Act of ensuring that markets for

       consumer financial products and services are fair, transparent, and competitive."

       10822 Federal Register / Vol. 78, No. 31 / Thursday, February 14, 2013 / Rules and

       Regulations

6.    The purpose of statutory dual tracking prohibitions "is to prevent mortgage servicers

       from having it both ways: a servicer cannot pursue mortgage foreclosure while also

       considering a borrower's timely submitted loan modification application."  Mann v.

       Nationstar Mortg., LLC, No. 14-99 (MJD/HB) (D. Minn. 2015).

7.    Borrowers, who have no voice in selecting which mortgage servicers handle their loans, have few market mechanisms they can employ to deter dual tracking and other mortgage servicing abuses.

8.    Defendants' actions and omissions violated the Real Estate Settlement Procedures Act and its implementing Regulation X, 12 C.F.R. Part 1024; the Minnesota Homeowner's Bill of Rights, Minn. Stat. § 582.043; the Minnesota Residential Mortgage Originator and Servicer Licensing Act, Minn. Stat. Ch. 58; Defendants' duty of good faith and fair dealing; the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 ff.; slander of title; tortious interference with prospective contractual relations; and unjust enrichment.

9.    Defendants have put Plaintiffs through an ongoing three-year nightmare ordeal, with their home on the line.

## **PARTIES**

10.   Plaintiffs Justin J. and Michelle K. Dekker are natural persons who reside in the city of Edina, County of Hennepin, State of Minnesota, and are "borrowers" as that term is used in 12 C.F.R. § 1024.41 and defined by Minn. Stat. § 58.02, Subd.4, and "mortgagors" as that term is defined in Minn. Stat. § 582.043.

11.   Defendant Cenlar FSB ("Cenlar") does business in Minnesota, and is a "servicer" as that term is defined in 12 C.F.R. § 1024.2(b) and by Minn. Stat. § 58.02, Subd. 20.

12.   As a mortgage servicer, Cenlar regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another, and Cenlar is therefore a "debt collector" as that term is defined by 15 U.S.C. § 1692a(6).

13.   Cenlar performs various servicing functions, and does not solely engage in enforcing security interests.

14.   Defendant CitiMortgage, Inc. ("CitiMortgage") does business in Minnesota, and is a "servicer" as that term is defined in 12 C.F.R. § 1024.2(b) and by Minn. Stat. § 58.02, Subd. 20.

## FACTUAL ALLEGATIONS

### Events up to April 1, 2019

15.   In 2017, Plaintiffs submitted a loss mitigation application to the servicer of their home mortgage loan, Defendant CitiMortgage.

16.   In a letter to Plaintiffs dated November 16, 2017, CitiMortgage acknowledged that it had received Plaintiffs' completed loss mitigation application on November 15, 2017.

17.   CitiMortgage's November 16, 2017, letter promised, "Foreclosure activity will cease and we will not make the first notice or filing, whichever is applicable, while your complete application is being evaluated."

18.   In a telephone conversation on November 21, 2017, CitiMortgage again confirmed to Plaintiffs that CitiMortgage had everything it needed from Plaintiffs to evaluate Plaintiffs' loss mitigation application.

19.   CitiMortgage failed, within 30 days of November 16, 2017, to provide Plaintiffs a
      notice in writing stating CitiMortgage's determination of which loss mitigation
      options, if any, it would  offer to Plaintiffs on behalf of the owner or assignee of
      the mortgage.

20.   CitiMortgage also failed, within that 30-day period or promptly thereafter, to
      provide Plaintiffs a written notice, informing Plaintiffs that CitiMortgage had not
      received documents or information not in the Plaintiffs' control that CitiMortgage
      required to determine which loss mitigation options, if any, it would offer to
      Plaintiffs.

21.   CitiMortgage informed Plaintiffs that CitiMortgage would not accept payments
      from Plaintiffs while they were in the modification process.

22.   By refusing to accept payments from Plaintiffs while they were in the modification
      process and at the same time failing to act on Plaintiffs' modification application,
      CitiMortgage unjustifiably hindered Plaintiffs from performing under the original
      mortgage loan agreement.

23.   Despite having acknowledged receipt of Plaintiff's *completed* loss mitigation
      application, CitiMortgage insisted that Plaintiffs supply additional documents.

24.   Plaintiffs duly complied and submitted or resubmitted all documents CitiMortgage
      requested.

25.   In a March 27, 2018, email to Plaintiffs, CitiMortgage again confirmed,
      "CitiMortgage has now received all of the documents required at this point in time

to send your application for mortgage payment assistance to our Underwriting

Department for review."

26.    CitiMortgage's March 27, 2018, email again promised, "Foreclosure activity will

cease while your complete application is being evaluated."

27.    CitiMortgage again failed, within 30 days of March 27, 2018, to provide Plaintiffs

a notice in writing stating CitiMortgage's determination of which loss mitigation

options, if any, it would  offer to Plaintiffs on behalf of the owner or assignee of

the mortgage.

28.    CitiMortgage also again failed, within that 30-day period or promptly thereafter, to

provide Plaintiffs a written notice, informing Plaintiffs that CitiMortgage had not

received documents or information not in the Plaintiffs' control that CitiMortgage

required to determine which loss mitigation options, if any, it would offer to

Plaintiffs.

29.    Despite having repeatedly acknowledged receipt of Plaintiff's *completed* loss

mitigation applications, CitiMortgage again insisted that Plaintiffs supply

additional documents.

30.    Plaintiffs again duly complied and submitted or resubmitted all documents

CitiMortgage requested.

31.    In a May 4, 2018, email to Plaintiffs, a CitiMortgage representative again

confirmed, "We have everything needed at this time to compete your review. I

will be sending your file over to an underwriter immediately to begin this

process."

32.    CitiMortgage again failed, within 30 days of May 4, 2018, to provide Plaintiffs a notice in writing stating CitiMortgage's determination of which loss mitigation options, if any, it would  offer to Plaintiffs on behalf of the owner or assignee of the mortgage.

33.    CitiMortgage also again failed, within that 30-day period or promptly thereafter, to provide Plaintiffs a written notice, informing Plaintiffs that CitiMortgage had not received documents or information not in the Plaintiffs' control that CitiMortgage required to determine which loss mitigation options, if any, it would offer to Plaintiffs.

34.    Despite having repeatedly acknowledged receipt of Plaintiff's *completed* loss mitigation applications, CitiMortgage again insisted that Plaintiffs supply additional documents.

35.     Plaintiffs again duly complied and submitted or resubmitted all documents CitiMortgage requested.

36.    Plaintiffs then received a letter from CitiMortgage dated August 30, 2018, which threatened, "Your property may be referred to foreclosure unless immediate action is taken."

37.    CitiMortgage's August 30, 2018, letter further stated, "We have offered or undertaken loss mitigation efforts with respect to your loan."

38.    CitiMortgage had never offered any loss mitigation option to Plaintiffs.

39.    CitiMortgage's August 30, 2018, letter continued, "Unfortunately, you have been unable to complete a successful loss mitigation treatment."

40.     CitiMortgage had repeatedly told Plaintiffs that their loss mitigation applications were complete.

41.     CitiMortgage's August 8, 2018, letter continued, "If you believe that your application for loss mitigation was denied in error, or if you would like to discuss any alternative to foreclosure, including a loan modification, please contact us immediately."

42.     CitiMortgage had never indicated to Plaintiffs that their applications for loss mitigation had been denied.

43.     Plaintiffs did immediately contact CitiMortgage and were informed that they would have to start all over with an entirely new loss mitigation application.

44.     On September 5, 2018, Plaintiffs started a new loss mitigation application with CitiMortgage.

45.     On September 12, 2018, Plaintiffs submitted documents for their new loss mitigation application.

46.     In a telephone call on September 20, 2018, a CitiMortgage representative confirmed that CitiMortgage had received all of Plaintiffs' documents.

47.     In a letter dated September 27, 2018, CitiMortgage indicated that Plaintiffs needed to submit the documents that Plaintiffs had already submitted on September 12 and that CitiMortgage had confirmed receiving.

48.     On October 3, 208, Plaintiffs resubmitted copies of the documents they had already submitted on September 12, 2018.

49.  In a telephone call on October 11, 2018, a CitiMortgage representative confirmed that CitiMortgage had all the documents they needed from Plaintiffs.

50.  In a letter dated October 15, 2018, CitiMortgage indicated that it needed additional documents from Plaintiffs.

51.  In a telephone call on October 18, 2018, a CitiMortgage representative stated that the internal tool they used had been "on the fritz" and needed to be reset, and that Plaintiffs should call back another day.

52.  In a telephone call on October 22, 2018, a CitiMortgage representative confirmed that CitiMortgage had received Plaintiffs' documents, but that their internal tool was still not working.

53.  Over the next several weeks, CitiMortgage requested and Plaintiffs duly submitted or resubmitted various documents.

54.  CitiMortgage representative Randy Howland was designated as Plaintiffs' "Single Point of Contact."

55.  In an email dated December 5, 2018, Howland stated to Plaintiffs, "There was a little bit of a timing issue on these final documents. I have a request to get your account back with the underwriter."

56.  In an email later that day, Plaintiff Justin Dekker responded, "Thank you for the update and will send paystubs as they become available.  Just out of curiosity, what was the timing issue?  And what are the next steps if the file does go back to underwriting or if it doesn't go back to underwriting?"

57.   In an email dated December 13, 2018, Howland responded, "The timing issue was our internal problems," and requested certain bank statements that to Plaintiffs' knowledge had already been submitted.

58.   Howland's email failed to include a reasonable date by which Plaintiffs should submit the documents necessary to make the loss mitigation application complete.

59.   In an email later that day, Justin responded, "We should already have those monthly statements in entirety on file. Happy to resubmit if needed. Just let us know."

60.   Howland responded, "This is what was explained to me that we need, **COMPLETE BUSINESS ASSET/BANK STATEMENTS REQUIRED THAT MATCH UP TO YOUR profit and loss statement."

61.   Howland's email again failed to include a reasonable date by which Plaintiffs should submit the documents necessary to make the loss mitigation application complete.

62.   Plaintiffs explained to Howland that Plaintiff Michelle Dekker is part owner of a family business, but that she does not control that business, that any requests for bank statements from that business had to go through a third party, and that based on CitiMortgage's prior communications to Plaintiffs, Plaintiffs believed that the third party had already submitted the requested documents directly to CitiMortgage.

63.   In an email dated December 28, 2018, Plaintiffs inquired of Howland, "Is there something specific the underwriter is looking for?"

64.    In an email dated January 14, 2019, Howland responded, "The underwriter was looking for bank statements that reflected the income of your business.  Your account, now, however, is no longer with the underwriter."

65.    Howland's email yet again failed to include a reasonable date by which Plaintiffs should submit the documents necessary to make the loss mitigation application complete.

66.    Howland's email also failed to explain the significance of the account no longer being with the underwriter and whether the account could be sent back to the underwriter.

67.    In an email later that day, Plaintiff Justin Dekker, believing that all the requested monthly bank statements had already been submitted, responded to Howland, "Please let me know which monthly business bank statements are missing and I will request they are submitted to you in the next couple of days.  Is there any other documentation that is needed by the underwriter to get this finished?"

68.    Having received no response, Justin emailed Howland again on January 22, 2019: "Following up on my email below to learn what documents the underwriter needs to complete the modification.  Please advise."

69.    Plaintiffs then received a letter from CitiMortgage dated January 15, 2019, which again threatened, "Your property may be referred to foreclosure unless immediate action is taken."

70.    CitiMortgage's January 15, 2019, letter further stated, "We have offered or undertaken loss mitigation efforts with respect to your loan."

71.  CitiMortgage had still never offered any loss mitigation option to Plaintiffs.

72.  CitiMortgage's January 15, 2019, letter continued, "If you believe that your application for loss mitigation was denied in error, or if you would like to discuss any alternative to foreclosure, including a loan modification, please contact us immediately."

73.  CitiMortgage had still never indicated to Plaintiffs that their applications for loss mitigation had been denied.

74.  On January 28, 2019, Justin emailed Howland:  "I have not heard from you for a couple of weeks and received a concerning letter in the mail last week.  Please advise what additional documents are needed by the underwriter for the modification."

75.  On February 1, 2019, Justin again emailed Howland:  "We are looking forward to completing the modification process. Can you please let us know what documents you need for us to keep this moving forward."

76.  Howland finally responded, "You're not really on my radar any longer," and stated that if Plaintiffs still wanted to be considered for loss mitigation, they would have to submit new documents.

77.  Plaintiffs duly submitted or resubmitted the requested documents.

78.  In a letter dated February 9, 2019, CitiMortgage notified Plaintiffs that "we have referred your mortgage loan to foreclosure counsel to begin foreclosure proceedings."

79.   In a letter dated February 11, 2019, CitiMortgage, through Usset, sent Plaintiffs the first notice required by Minnesota law for a non-judicial foreclosure process, namely, the Preforeclosure Notice required by Minn. Stat. § 580.021.

80.   In a telephone call on February 13, 2019, a CitiMortgage representative confirmed to Plaintiffs that CitiMortgage had received Plaintiffs' documents.

81.   In a letter to Plaintiffs dated February 19, 2019, CitiMortgage acknowledged that it had received Plaintiffs' completed loss mitigation application on February 18, 2019.

82.   CitiMortgage's February 19, 2019, letter promised, "The first notice or filing commencing a foreclosure has taken place, however, we will not conduct a foreclosure sale while your complete application is being evaluated. … After we complete our review, we will notify you of our decision."

83.   CitiMortgage yet again failed, within 30 days of February 18, 2019, to provide Plaintiffs a notice in writing stating CitiMortgage's determination of which loss mitigation options, if any, it would  offer to Plaintiffs on behalf of the owner or assignee of the mortgage.

84.   CitiMortgage also yet again failed, within that 30-day period or promptly thereafter, to provide Plaintiffs a written notice, informing Plaintiffs that CitiMortgage had not received documents or information not in the Plaintiffs' control that CitiMortgage required to determine which loss mitigation options, if any, it would offer to Plaintiffs.

85.   Despite having yet again acknowledged receipt of Plaintiff's *completed* loss

mitigation application, CitiMortgage yet again insisted that Plaintiffs supply

additional documents.

86.   Specifically, in a letter dated February 21, 2019, CitiMortgage requested certain

documents, and indicated that they should be returned by March 23, 2019.

87.   Plaintiffs duly complied and yet again submitted or resubmitted all documents

CitiMortgage requested.

88.   In an email dated March 6, 2019, a CitiMortgage representative stated to

Plaintiffs, "Thank you for sending the recent documents. We received them. This

file has been forwarded to be reviewed for hardship assistance. No further

documents or information is being requested from you at this time."

89.   The signature block for the March 6, 2019, email indicated it was from

"Kyle Milburg  Single Point of Contact."

90.   In the email, Milburg stated, "I'm following up on behalf of your assigned Single

Point of Contact Randal Howland. … If you have any questions please contact

Randal at the phone number or email address listed below.  Thank you.  Randal

Howland at 1-855-843-2549, extension 0475081, or by email at

randal.douglas.howland@citi.com."

91.   The March 6, 2019, email continued, "Remember, during any point of your

treatment review you can reach your assigned Single Point of Contact Danny

Trevino at 1-855-843-2549 extension 0366447, Monday - Friday 8:00 a.m. - 5:00

p.m. (CT), or email me at kyle.j.milburg@citi.com."

92.   CitiMortgage had simultaneously assigned multiple (at least three) "Single Point(s) of Contact."

93.   On March 14, 2019, Plaintiff Justin Dekker spoke by phone with Howland.

94.   In the March 14, 2019, telephone conversation, CitiMortgage, through its representative Howland, again confirmed that underwriting had everything they had requested from Plaintiffs and indicated that underwriting should be able to put together a loan modification.

95.   CitiMortgage yet again failed, within 30 days of March 6, 2019, to provide Plaintiffs a notice in writing stating CitiMortgage's determination of which loss mitigation options, if any, it would  offer to Plaintiffs on behalf of the owner or assignee of the mortgage.

96.   Despite having repeatedly acknowledged that it had received all the documents it needed from Plaintiffs, CitiMortgage subsequently yet again insisted that Plaintiffs supply additional documents.

97.   Specifically, in a letter dated March 19, 2019, CitiMortgage requested certain documents, and indicated that they should be returned by April 18, 2019.

98.   Plaintiffs duly complied and yet again submitted or resubmitted all documents CitiMortgage requested.

99.   In a telephone call on March 20, 2019, Usset's representative Tara informed Plaintiffs that Usset's file on the account had been closed on March 15, 2019.

100.   In a letter to Plaintiffs dated March 28, 2019, CitiMortgage acknowledged that it had received Plaintiffs' completed loss mitigation application on March 27, 2019, which was well before the April 18 deadline CitiMortgage had indicated.

101.   CitiMortgage's March 28, 2019, letter promised, "The first notice or filing commencing a foreclosure has taken place, however, we will not conduct a foreclosure sale while your complete application is being evaluated.  …  After we complete our review, we will notify you of our decision."

102.   CitiMortgage never provided Plaintiffs a notice in writing stating CitiMortgage's determination of which loss mitigation options, if any, it would  offer to Plaintiffs on behalf of the owner or assignee of the mortgage.

103.   Subsequent to March 28, 2019, CitiMortgage never provided Plaintiffs with any notice that any additional documents were required from Plaintiffs.

104.   CitiMortgage also yet again failed, within that 30-day period or promptly thereafter, to provide Plaintiffs a written notice, informing Plaintiffs that CitiMortgage had not received documents or information not in the Plaintiffs' control that CitiMortgage required to determine which loss mitigation options, if any, it would offer to Plaintiffs.

**Events April 1, 2019 to December 14, 2020**

105.   Effective April 1, 2019, CitiMortgage transferred the servicing of Plaintiffs' mortgage loan to Defendant Cenlar.

106.   CitiMortgage entered into an agreement with Cenlar, where CitiMortgage utilized Cenlar to perform various servicing functions.

107. CitiMortgage remained the principal servicer on the loan, while Cenlar, as sub-servicer, became Plaintiffs' point of contact.

108. Cenlar acted as CitiMortgage's agent and under CitiMortgage's actual and apparent authority.

109. CitiMortgage was negligent in selecting, supervising, and otherwise controlling Cenlar.  That statement will likely have further evidentiary support after a reasonable opportunity for further investigation or discovery.

110. Plaintiffs' debt was in default at the time it was obtained by Cenlar.

111. Wells Fargo remained the creditor to whom Plaintiffs' debt was owed.

112. In a welcome letter to Plaintiffs dated March 22, 2019, a Cenlar representative stated, "I'd like to take this opportunity to assure you that the level of servicing you previously received will continue uninterrupted."

113. Plaintiffs took no comfort from that prophetic assurance.

114. Cenlar failed, within 30 days of March 28, 2019, or within 30 days of the date of the servicing transfer to provide Plaintiffs a notice in writing stating Cenlar's determination of which loss mitigation options, if any, it would  offer to Plaintiffs on behalf of the owner or assignee of the mortgage, based on Plaintiffs' completed loss mitigation application that was pending at the time of the transfer of servicing to Cenlar.

115. Cenlar also failed, within that 30-day period or promptly thereafter, to provide Plaintiffs a written notice, informing Plaintiffs that Cenlar had not received

documents or information not in the Plaintiffs' control that Cenlar required to determine which loss mitigation options, if any, it would offer to Plaintiffs.

116. CitiMortgage and Cenlar failed to ensure that the documents Plaintiffs had submitted to CitiMortgage were made available to Cenlar.

117. Shortly after Cenlar began servicing the loan, Plaintiffs signed up for Cenlar's online portal, with the intent of being able to send and receive documents through the portal.

118. Cenlar's online portal failed to allow Plaintiffs to send documents or to access documents from Cenlar.

119. But because Plaintiffs had signed up for Cenlar's online portal, Cenlar's system stopped mailing documents to Plaintiffs.

120. Therefore, for a time, Cenlar did not deliver communications to Plaintiffs either through the online portal or by mail.

121. On multiple occasions, including in telephone calls on April 11 and April 29, 2019, Cenlar informed Plaintiffs that Cenlar would not accept payments from Plaintiffs while they were in the modification process.

122. By refusing to accept payments from Plaintiffs while they were in the modification process and at the same time failing to act on Plaintiffs' modification application, Cenlar unjustifiably hindered Plaintiffs from performing under the original mortgage loan agreement.

123. For the next several months, Plaintiffs sought to get an update from Cenlar on the status of their loss mitigation application.

124.   Plaintiff Justin Dekker made dozens of telephone calls to Cenlar inquiring about the status of the application.

125.   Cenlar representatives repeatedly told Plaintiffs that Cenlar was waiting on documents from CitiMortgage.

126.   CitiMortgage's failure to provide the necessary documents and information to Cenlar violated CitiMortgage's written agreements with investors, other licensees, or exempt persons.  That statement will likely have further evidentiary support after a reasonable opportunity for further investigation or discovery.

127.   In the alternative, Cenlar's representations that it did not have all the necessary documents and information from CitiMortgage were false.

128.   In a telephone call on May 14, 2019, a Cenlar representative told Mr. Dekker that the account was with the foreclosure law firm, Usset.

129.   Sometime between March 20 and May 14, 2019, Cenlar referred the account to Usset for foreclosure.

130.   In the alternative, Cenlar's May 14, 2019, representation that the account was with Usset was false.

131.   Eventually, Cenlar informed Plaintiffs that they would need to start all over again with a new loss mitigation application.

132.   One or more Cenlar representatives told Plaintiffs that Cenlar would send them a new loan modification application.

133.   Because Plaintiffs had signed up for Cenlar's online portal, Cenlar did not mail the application to Plaintiffs.

134. However, because of the status of the account, Cenlar would not allow Plaintiffs to use the online portal to access the application.

135. Cenlar thereby failed to timely deliver the application to Plaintiffs either by mail or through the online portal.

136. After several escalating telephone calls and emails that Plaintiff Justin Dekker made to Cenlar to explain that Cenlar had not delivered the application, Cenlar finally, on or after June 17, 2019, sent the application to Plaintiffs.

137. Cenlar would not allow Plaintiffs to use Cenlar's online document submission system.

138. On June 28, 2019, Plaintiffs  returned the new loss mitigation application package to Cenlar by mail, fax, and email to make certain that Cenlar received it

139. In a letter dated July 3, 2019, Cenlar notified Plaintiffs that their application was supposedly incomplete, and that they needed to submit certain documents by August 17, 2019.

140. Plaintiffs duly complied and on July 15, 2019, submitted or resubmitted all documents Cenlar requested.

141. At Cenlar's request, Plaintiffs resubmitted certain documents that they had already submitted to Cenlar.

142. Well before August 17 – the deadline Cenlar had given Plaintiffs to submit additional documents for their pending modification application – Defendants recorded, on July 23, 2019, a Notice of Pendency to Foreclose on Plaintiffs' home.

143. The July 23, 2019, Notice of Pendency to Foreclose falsely implied that there was no pending loss mitigation application.

144. The July 23, 2019, Notice of Pendency to Foreclose, recorded and made a public record in Hennepin County, created a cloud on the title that impaired Plaintiffs' ability to refinance with another lender and/or servicer or to sell the home.

145. On August 3, 2019, Plaintiffs were served with notice from Usset, dated July 17, 2019, that a foreclosure sale of their home would occur on September 17, 2019.

146. Sometime between March 20 and July 17, 2019, Cenlar referred the account to Usset for foreclosure.

147. When Plaintiffs received the notice that their home was scheduled to be sold the following month, the emotional distress that had been building over the nearly two years that they had in good faith struggled so hard in vain to obtain a loan modification, first from CitiMortgage and then from Cenlar, became even more extreme.

148. In a telephone call on August 6, 2019, a Cenlar representative confirmed that Cenlar had all the required documents.

149. In a telephone call on August 7, 2019, a Cenlar representative falsely stated that certain documents had not been received from Plaintiff.

150. After Plaintiff Justin Dekker explained to that representative that other Cenlar representatives had already confirmed Cenlar's receipt of the documents in question, the representative put Mr. Dekker on hold for several minutes, then returned and admitted that Cenlar had received all of the documents.

151.   In a letter to Plaintiffs dated August 14, 2019, which was not delivered to
       Plaintiffs until August 22, 2014, Cenlar acknowledged, "A review on 08/09/2019
       determined the application is complete and no further information is needed at this
       time."

152.   Cenlar's August 14, 2019, letter promised, "Although the foreclosure process has
       begun, we will not conduct a foreclosure sale of your property until your complete
       assistance package has been evaluated," and stated, "Once a thorough
       underwriting evaluation of your application has been completed, we will contact
       you with our decision."

153.   However, as of August 22, 2019, Cenlar had not canceled or postponed the
       foreclosure sale scheduled for September 17, 2019.

154.   As of August 24, 2019, Plaintiffs were alarmed to see that their home was still
       listed on auction.com and posted on Zillow as a foreclosure.

155.   Cenlar misleadingly advertised the foreclosure sale in the Minneapolis Star
       Tribune.

156.   Cenlar caused Plaintiffs' home to be listed in the multiple listing service ("MLS")
       database of houses for sale.

157.   Strangers repeatedly appeared at Plaintiffs front door inquiring about buying the
       house.

158.   On August 26, 2019, Plaintiffs received two letters from Cenlar.

159.   One of the letters that Plaintiffs received on August 26, dated August 15, 2019, acknowledged that Plaintiffs had provided documentation but requested that Plaintiffs provide certain "additional information."

160.   The other letter that Plaintiffs received on August 26, dated August 16, 2019, did not acknowledge that Cenlar had received any documentation from Plaintiffs and indicated that Plaintiffs needed to complete and sign a new request for workout.

161.   In light of Cenlar's confusing and contradictory letters, on August 26, 2019, Plaintiff Justin Dekker called Cenlar for clarification.

162.   On that August 26, 2019, telephone call, Cenlar's representative "Mrs. Deckline" told Justin Dekker that Plaintiffs' application was completed on August 9, that the application was now with underwriting, and that the August 15 and August 16 letters had been sent in error.

163.   The application was in fact completed on August 9, 2019, and Cenlar had all the information necessary from Plaintiffs on that date.

164.   In the alternative, Cenlar's August 26 representation, through Mrs. Deckline, that the application was complete and that the August 15 and August 16 letters had been sent in error was false.

165.   Cenlar, through Mrs. Deckline, advised Plaintiff to wait for 30 days after August 9, 2019, for a decision from Cenlar.

166.   Plaintiffs relied on Cenlar's representation that the application was complete and that the August 15 and August 16 letters had been sent in error.

167.   Cenlar again failed, within 30 days of August 9, 2019, to provide Plaintiffs a
       notice in writing stating Cenlar's determination of which loss mitigation options, if
       any, it would  offer to Plaintiffs on behalf of the owner or assignee of the
       mortgage.

168.   Cenlar also again failed, within that 30-day period or promptly thereafter, to
       provide Plaintiffs a written notice, informing Plaintiffs that Cenlar had not
       received documents or information not in the Plaintiffs' control that Cenlar
       required to determine which loss mitigation options, if any, it would offer to
       Plaintiffs.

169.   Each time Cenlar scheduled a foreclosure sale date, Plaintiffs had to proactively
       campaign to get it postponed because Cenlar still had not acted on Plaintiffs' loss
       mitigation application.

170.   In a letter dated September 5, 2019, Cenlar notified Plaintiffs that their application
       was supposedly incomplete.

171.   In the September 5 letter, Cenlar stated, "We will allow 30 days from the date of
       this letter for you to provide the requested information."

172.   On September 13, 2019, Plaintiffs resubmitted documents they had already
       submitted to Cenlar but that Cenlar had requested again.

173.   After Plaintiffs submitted the documents on September 13, but well before 30 days
       had elapsed from the September 5 letter stating that Cenlar would give Plaintiffs
       30 days, Defendants recorded, on September 16, 2019, another Notice of
       Pendency to Foreclose on Plaintiffs' home.

174.   The September 16, 2019, Notice of Pendency to Foreclose again falsely implied that there was no pending loss mitigation application.

175.   The September 16, 2019, Notice of Pendency to Foreclose, recorded and made a public record in Hennepin County, created an additional cloud on the title that further impaired Plaintiffs' ability to refinance with another lender and/or servicer or to sell the home.

176.   Cenlar eventually postponed the foreclosure sale from September 17 to October 29, 2019.

177.   In a letter to Plaintiffs dated September 27, 2019, Cenlar acknowledged, "A review on 09/24/2019 determined the application is complete and no further information is needed at this time."

178.   Cenlar's September 27, 2019, letter again stated, "Once a thorough underwriting evaluation of your application has been completed, we will contact you with our decision."

179.   Cenlar again failed, within 30 days of September 24, 2019, to provide Plaintiffs a notice in writing stating Cenlar's determination of which loss mitigation options, if any, it would  offer to Plaintiffs on behalf of the owner or assignee of the mortgage.

180.   Cenlar also again failed, within that 30-day period or promptly thereafter, to provide Plaintiffs a written notice, informing Plaintiffs that Cenlar had not received documents or information not in the Plaintiffs' control that Cenlar

required to determine which loss mitigation options, if any, it would offer to Plaintiffs.

181. In a telephone call on October 9, 2019, Cenlar confirmed that it had everything it needed from Plaintiffs.

182. In that telephone call, Cenlar's representative told Plaintiff Justin Dekker that the foreclosure sale would be put on hold in light of the completed application.

183. On October 14, 2019, Plaintiff Justin Dekker called the law firm, Defendant Usset, to confirm that the October 29 foreclosure sale had been put on hold.

184. On that telephone call, Usset's representative Tara told Mr. Dekker that the foreclosure sale had not been put on hold and was still scheduled for October 29.

185. Usset's representative told Mr. Dekker that Usset could not put the sale on hold without direction from Cenlar.

186. On October 15, 2019, Mr. Dekker called Cenlar.

187. On that telephone call, Cenlar again confirmed that the application was complete and that no additional documents were needed from Plaintiffs.

188. Mr. Dekker asked what could be done to cancel the October 29 foreclosure sale.

189. Cenlar advised Mr. Dekker to call Usset, which he had already done.

190. Finally, on October 17, 2019, Cenlar again postponed the foreclosure sale, this time from October 29 to December 10, 2019.

191. As December 10, 2019, approached, Cenlar still had not acted on Plaintiffs' loss mitigation application.

192. Plaintiffs had to plead with Cenlar to again postpone the foreclosure sale.

193.   On Friday, December 6, 2019 – just four days before the scheduled December 10, 2019, foreclosure sale – Cenlar, through counsel, finally notified Plaintiffs that the sale would be postponed.

194.   The sale was postponed until February 18, 2020.

195.   In a letter to Plaintiffs dated January 16, 2020, Cenlar acknowledged, "A review on 01/14/2020 determined the application is complete and no further information is needed at this time."

196.   Cenlar's January 16, 2020, letter again stated, "Once a thorough underwriting evaluation of your application has been completed, we will contact you with our decision."

197.   Cenlar again failed, within 30 days of January 14, 2020, to provide Plaintiffs a notice in writing stating Cenlar's determination of which loss mitigation options, if any, it would  offer to Plaintiffs on behalf of the owner or assignee of the mortgage.

198.   Cenlar also again failed, within that 30-day period or promptly thereafter, to provide Plaintiffs a written notice, informing Plaintiffs that Cenlar had not received documents or information not in the Plaintiffs' control that Cenlar required to determine which loss mitigation options, if any, it would offer to Plaintiffs.

199.   As February 18, 2020, approached, Cenlar still had not acted on Plaintiffs' loss mitigation application.

200.   With some effort, Plaintiffs were able to convince Cenlar to again postpone the foreclosure sale, this time from February 18 to June 9, 2020.

201.   In a letter to Plaintiffs dated March 16, 2020, Cenlar acknowledged, "A review on 03/12/2020 determined the application is complete and no further information is needed at this time."

202.   Cenlar's March 16, 2020, letter yet again stated, "Once a thorough underwriting evaluation of your application has been completed, we will contact you with our decision."

203.   Cenlar yet again failed, within 30 days of March 12, 2020, to provide Plaintiffs a notice in writing stating Cenlar's determination of which loss mitigation options, if any, it would  offer to Plaintiffs on behalf of the owner or assignee of the mortgage.

204.   In a letter dated April 10, 2020, Cenlar stated, "We have determined that additional documentation is needed, which is held by a third party. … We must receive the following additional document(s) from the appropriate third party: Pending Investor Decision"

205.   Cenlar failed to exercise reasonable diligence in obtaining such documents or information.  That statement will likely have further evidentiary support after a reasonable opportunity for further investigation or discovery.

206.   As June 9, 2020, approached, Cenlar still had not acted on Plaintiffs' loss mitigation application.

207.  With some effort, Plaintiffs were able to convince Cenlar to again postpone the foreclosure sale, this time from June 9 to July 21, 2020.

208.  As July 21, 2020, approached, Cenlar still had not acted on Plaintiffs' loss mitigation application.

209.  The foreclosure sale was again postponed, to September 29, 2020.

210.  Despite having repeatedly acknowledged receipt of Plaintiff's *completed* loss mitigation applications, Cenlar, in a letter dated September 22, 2020, yet again insisted that Plaintiffs supply additional documents.

211.  Plaintiffs duly complied and submitted or resubmitted all documents Cenlar requested.

212.  In a letter dated September 29, 2020, Plaintiffs were notified that the foreclosure sale had been postponed until January 12, 2021.

213.  In a letter to Plaintiffs dated October 26, 2020, Cenlar acknowledged, "A review on 10/23/2020 determined the application is complete and no further information is needed at this time."

214.  In a letter dated October 27, 2020, Plaintiffs, through counsel, sent Cenlar a formal Notice of Error under Regulation X that explained that Cenlar had erred by initiating and not canceling the foreclosure.

215.  Plaintiffs October 27, 2020, letter explained, "To correct those errors, you should immediately cancel the scheduled foreclosure sale and any related legal advertisement of the sale."

216. Plaintiffs October 27, 2020, letter also included a formal Request for Information under Regulation X, regarding Plaintiffs' loan modification applications, their status, the reasons for any determination that a loan modification was not available, and foreclosure proceedings on the account.

217. Plaintiffs' October 27, 2020, letter was sent to the address Cenlar had established and required borrowers to use to submit Qualified Written Requests, Notices of Error, and Requests for Information.

218. Cenlar Received Plaintiffs' October 27, 2020, letter by November 2, 2020.

219. Plaintiffs' October 27, 2020, letter put Cenlar on notice that Plaintiffs were represented by an attorney.

220. In a letter date November 19, 2020, (the response letter), Cenlar ostensibly responded to Plaintiffs' October 27, 2020, letter.

221. Cenlar's response letter did not provide any notification that Cenlar had corrected the error of initiating and not canceling the foreclosure.

222. Cenlar did not cancel the foreclosure sale within 30 business days of receiving Plaintiffs' October 27, 2020, letter.

223. Cenlar's response letter did not provide written notification that Cenlar had determined that no error occurred or a statement of the reason or reasons for such a determination.

224. Cenlar's response letter did not completely respond to Plaintiffs' Request for Information.

225.  Cenlar's response letter did not indicate that Cenlar had determined that it was not required to comply.

226.  Enclosed with Cenlar's response letter was a partial history of the account that included wrongful charges, including without limitation wrongful attorney's fees and other foreclosure expenses.

227.  The attorney's fees and other foreclosure expenses were wrongful because they were incurred due to CitiMortgage's and Cenlar's improper referral to foreclosure attorneys and failure to recall the account from Usset.

228.  In a separate letter, also dated November 19, 2020, (the approval letter), Cenlar finally notified Plaintiffs that they had been approved for a loan modification.

229.  Cenlar sent its approval letter directly to the Dekkers even though Cenlar knew they were represented by an attorney.

230.  Cenlar's approval letter did not reference any trial modification or any trial payments.

231.  Cenlar's approval letter indicated that the monthly payment amount under the modification would be $3,772.10, but that there might be "additional requirements and/or contributions" in the final agreement.

232.  Cenlar's November 19, 2020, approval letter stated, "You will be sent your final modification agreement in a separate letter. Once you receive the final modification agreement, you must complete, sign, and return it within 14 days from the date of the final modification agreement cover letter. Please make sure to read the modification agreement cover letter which will advise you of any

additional requirements and/or contributions that may be necessary as a condition of your modification approval."

233. Cenlar's approval letter further warned, "Failure to sign, notarize and return the corrected final modification package may result in this offer being withdrawn."

234. Cenlar's November 19, 2020, approval letter contained nothing for Plaintiffs to sign and return if they chose to accept the modification.

235. Cenlar's approval letter indicated that the first monthly payment under the modification agreement would be due January 1, 2021.

236. Cenlar's approval letter did not indicate that the January 12, 2021, foreclosure sale had been canceled or postponed or that the foreclosure had been halted in any way.

237. Plaintiffs awaited the "separate letter" with the final modification agreement.

238. Usset, on behalf of Cenlar, sent Plaintiffs a letter, postmarked November 25, 2020, that demanded payment of $107,933.99 and threatened, "You must pay this amount, plus interest and other costs, to keep your house from going through a sheriffs sale."

239. Usset's November 25, 2020, letter further stated that the foreclosure sale was still scheduled for January 12, 2021.

240. There was no present right to deprive Plaintiffs of possession of the property because Plaintiffs' loan modification application had been approved on November 19, 2020.

241. Cenlar, through its counsel Usset, sent the November 25, 2020, letter directly to the Dekkers even though Cenlar knew they were represented by an attorney.

242. Defendants CitiMortgage and Cenlar improperly billed Plaintiffs for foreclosure attorney's fees for attorney services performed even after Plaintiffs had been approved for a loan modification and while Plaintiffs were waiting for Cenlar to send the paperwork so Plaintiffs could accept the modification.

243. Defendants CitiMortgage and Cenlar retained a benefit from the improperly billed attorney's fees.  That statement will likely have further evidentiary support after a reasonable opportunity for further investigation or discovery.

244. On December 9, 2020, Plaintiff Justin Dekker called Cenlar to inquire about the status of the final modification agreement.

245. A Cenlar representative stated that Cenlar had not sent the final modification agreement.

246. The Cenlar representative could not tell Justin when or if the final modification agreement would be sent.

**Events December 14, 2020, to July 1, 2021**

247. As of December 14, 2020, Plaintiffs had not received a "separate letter" with a final modification agreement.

248. As of December 14, 2020, Plaintiffs had not received any notice that the January 12, 2021, foreclosure sale had been canceled or postponed or that the foreclosure had been halted in any way.

249. This lawsuit was served on CitiMortgage on December 14, 2020.

250.   This lawsuit was served on Cenlar on December 18, 2020.

251.   Cenlar sent a letter regarding property taxes, dated December 14, 2020, directly to the Dekkers.

252.   Cenlar's December 14 letter was postmarked December 21, 2020.

253.   Cenlar falsely backdated to December 14, 2020, the letter that Cenlar actually mailed on December 21, 2020.

254.   As January 1, 2021 approached, Plaintiffs became increasingly distressed that the first payment was supposedly coming due, but they still had not received the final modification agreement.

255.   As January 12, 2021 approached, Plaintiffs became increasingly distressed that the foreclosure sale had not been cancelled and that they still had not received the final modification agreement.

256.   On December 31, 2020, Mr. Dekker telephoned Cenlar to make a payment.

257.   Cenlar's recorded greeting stated that Cenlar had located Plaintiffs' account information based on Mr. Dekker's telephone number.

258.   Cenlar's automated recording falsely referenced a "trial payment" and a non-existent "trial plan agreement" and "trial payment schedule" for Plaintiffs' account.

259.   Mr. Dekker made a payment of $3,772.10 by telephone on December 31, 2020.

260.   Cenlar's representative indicated that the account would not be taken out of foreclosure until Plaintiffs had signed and returned to Cenlar the final modification agreement – which Cenlar still had not sent to Plaintiffs.

261.  On January 4, 2021 – more than six weeks after Cenlar's November 19 letter
      stating that Plaintiffs were approved for a modification – Plaintiffs were finally
      notified that the foreclosure sale scheduled for the following week was cancelled.

262.  On January 5, 2021, Plaintiffs received from Cenlar a "Loan Modification
      Agreement" and cover letter, dated January 4, 2021.

263.  The January 4 cover letter stated that the monthly payment amount, including
      escrow, would be $3,823.46.

264.  The accompanying Loan Modification Agreement stated, "Borrower promises to
      make monthly payments of principal and interest of $1,026.45."

265.  Monthly payments of principal and interest of $1,026.45 was an arrangement that
      would result in negative amortization.

266.  The statement that Plaintiffs owed $1,026.45 a month for principal and interest
      was a false representation of the character and amount of the debt.

267.  The balance of the total monthly payment of $3,823.46 was presumably for
      escrow.

268.  The indication that Plaintiffs owed $2,797.01 a month for escrow was a false
      representation of the character and amount of the debt.

269.  The proposed Loan Modification Agreement included an inflated Unpaid Principal
      Balance amount, including without limitation the inclusion of wrongful attorney's
      fees that had been capitalized.

270.  The attorney's fees were wrongful because they were incurred due to
      CitiMortgage's and Cenlar's improper referral to foreclosure attorneys and failure

to recall the account from Usset even after Plaintiffs had been approved for the
loan modification.

271.   The cover letter stated that Plaintiffs were required to sign and return the
modification agreement within 14 days or the offered terms might expire.

272.   Plaintiffs were distressed to receive a cover letter and modification agreement that
falsely represented the character and amount of the debt and to have a 14-day
deadline to accept or risk that the modification offer would expire.

273.   On January 8, 2021, Plaintiffs, through counsel, notified Cenlar that the January 4
cover letter and modification agreement falsely represented the character and
amount of the debt.

274.   On January 13, 2021, Cenlar provided a revised modification agreement.

275.   The revised modification agreement still contained an inaccurate Unpaid Principal
Balance.

276.   On January 15, 2021, Plaintiffs, through counsel, notified Cenlar that they
questioned the Unpaid Principal Balance.

277.   By January 27, 2021, which was 14 days after Plaintiffs received the revised
modification agreement, Plaintiffs had not received a response from Cenlar as to
their concerns about the accuracy of the Unpaid Principal Balance.

278.   Plaintiffs had little choice but to accept the revised modification agreement or risk
the account going back to foreclosure.

279.   On January 27, 2021, Plaintiffs reluctantly accepted the revised Loan Modification
Agreement.

280. For weeks after Plaintiffs signed and returned the modification agreement, Cenlar failed to send Plaintiffs a fully-executed copy.

281. Minnesota's statute of frauds required the modification agreement to be signed both by Plaintiffs and by the lender to be effective.

282. Plaintiffs became increasingly distressed and concerned as to whether the lender would sign the Loan Modification Agreement and whether they were truly protected from foreclosure.

283. Cenlar did not send a copy of the fully-executed Loan Modification Agreement to Plaintiffs until March 4, 2021.

284. Wells Fargo had executed the Loan Modification Agreement on February 10, 2021.

285. Cenlar's delay from February 10 to March 4, 2021, was a further unreasonable delay in the processing of Plaintiffs' loan modification.

286. Cenlar sent Plaintiffs a monthly Loan Statement, dated February 1, 2021, that falsely stated a "Past Unpaid Amount" of $116,297.91 and falsely stated a payment amount due by March 1, 2021, of $119,877.35.

287. Cenlar sent Plaintiffs a monthly Loan Statement, dated March 1, 2021, that falsely stated a "Past Unpaid Amount" of $12,447.511 and falsely stated a payment amount due by April 1, 2021, of $15,516.95.

288. Cenlar's March 1, 2021, statement accurately showed that Plaintiffs had made a payment on March 1, 2021, but falsely stated that it was a partial payment.

289.  Cenlar sent Plaintiffs a monthly Loan Statement, dated April 1, 2021, that falsely stated a "Past Unpaid Amount" of $2,749.13 and falsely stated a payment amount due of $6,179.71.

290.  Cenlar's April 1, 2021, statement falsely stated that the next payment was due on 06/01/21, misleadingly suggesting that no payment was due on May 1.

291.  Cenlar sent Plaintiffs a monthly Loan Statement, dated May 3, 2021, that falsely stated a "Past Unpaid Amount" of  $2,356.25 and falsely stated a payment amount due by June 1 of $6,179.71.

292.  Cenlar sent Plaintiffs a monthly Loan Statement, dated June 1, 2021, that falsely stated a "Past Unpaid Amount" of $2,356.25 and falsely stated a payment amount due by July 1, 2021, of  $6,179.71.

293.  Each monthly statement that Cenlar has sent Plaintiffs since Plaintiffs and the lender agreed to the modification has falsely represented the character and amount of the debt.

294.  In March and April of 2021, Plaintiffs attempted to refinance their mortgage loan with a different lender to take advantage of current interest rates, which are lower than the interest rate in the modification agreement.

295.  Due in substantial part to the Notices of Pendency to Foreclose in the public record and their false implications, Plaintiffs have been turned down for refinancing.

296.   Because the Notices of Pendency to Foreclose are prohibiting Plaintiffs from

       refinancing, Plaintiffs are unable to take advantage of today's low interest rates

       and are stuck paying the higher interest rate in the modification agreement.

297.   Plaintiffs are also unable to use refinancing to escape from CitiMortgage's and

       Cenlar's costly and abusive servicing practices.

298.   As a result of Defendants' actions and omissions, Plaintiffs have suffered actual

       damages, including without limitation out-of-pocket expenses and emotional

       distress.

299.   Plaintiffs have suffered injuries in fact and imminently will suffer additional

       injuries in fact that are traceable to Defendants' conduct and that are likely to be

       redressed by a favorable decision in this matter.

300.   At all times pertinent hereto, Defendants acted by and through their agents,

       servants, and/or employees who acted within the course and scope of their agency

       or employment, and under the direct supervision and control of Defendants.


### Events July 1, 2021, to Present

301.   Cenlar sent Plaintiffs a monthly Loan Statement, dated July 1, 2021, that falsely

       stated a "Past Unpaid Amount" of $2,341.25 and falsely stated a payment amount

       due of $6,164.71.

302.   Cenlar's July 1, 2021, statement falsely stated that the next payment was due on

       09/01/21, misleadingly suggesting that no payment was due on August 1.

303.   Cenlar sent Plaintiffs a monthly Loan Statement, dated August 2, 2021, that
falsely stated a "Past Unpaid Amount" of $2,341.25 and falsely stated a payment
amount due by September 1, 2021, of $6,648.94.

304.   Cenlar sent Plaintiffs a monthly Loan Statement, dated September 1, 2021, that
falsely stated a "Past Unpaid Amount" of $2,341.25 and falsely stated a payment
amount due by October 1, 2021, of $6,211.56.

305.   Each monthly statement that Cenlar sent Plaintiffs since Plaintiffs and the lender
agreed to the modification falsely represented the character and amount of the
debt.

306.   Defendants' false and bewildering monthly statements caused Plaintiffs confusion
and anxiety as to how much they were actually supposed to pay.

307.   Plaintiffs wanted neither to overpay nor underpay: they remained stretched
financially, so paying more than was required would have created a hardship; but
they obviously did not want to underpay, as that could have put them at risk of
foreclosure. They just wanted to pay what was required – no more, no less.

308.   Defendants continued to confound Plaintiffs' efforts to decipher precisely how
much they were required to pay.

309.   Since the loan was modified, Plaintiffs made every payment as called for in the
Loan Modification Agreement, but were distressed that somehow, for reasons
unexplained, Defendants apparently did not consider the payments sufficient.

310.   On or about September 7, 2021, Plaintiffs viewed their "Mortgage Payment
History" on Cenlar's website.

311. Cenlar's website inaccurately showed multiple late payments since the loan was modified.

312. Plaintiffs decided to sell their home and requested a payoff statement from Cenlar.

313. The closing was scheduled for October 5, 2021.

314. Cenlar sent Plaintiffs a payoff statement dated September 8, 2021.

315. The payoff statement included an unexplained and erroneous "Corporate Advance" charge in the amount of $2,341.25.

316. The payoff statement included an inflated Unpaid Principal Balance amount that included wrongful attorney's fees and other foreclosure fees that were capitalized at the time of the loan modification.

317. In a letter dated September 13, 2021, Plaintiffs sent Cenlar a formal Notice of Error under Regulation X that explained that Cenlar had erred by: failing to provide an accurate payoff balance; issuing inaccurate monthly billing statements; and falsely indicating late payments on the website.

318. With respect to the notice of failure to provide an accurate payoff balance, Plaintiffs expressly advised Cenlar to respond within "seven business days, as required by 12 C.F.R. § 1024.35(e)(3)(i)(A)."

319. On or before September 20, 2021, Cenlar received Plaintiffs' Notice of Error.

320. Cenlar failed to respond within seven business days.

321. Cenlar sent Plaintiffs a monthly Loan Statement, dated October 1, 2021, that falsely stated a "Past Unpaid Amount" of $2,341.25 and falsely stated a payment amount due by November 1, 2021, of $6,211.56.

322.  On October 5, 2021, Plaintiffs were forced to close on the sale of their home without having received a response from Cenlar regarding the inaccurate payoff statement.

323.  Plaintiffs had no choice at closing but to pay the inaccurate and inflated payoff amount.

324.  The amount stated in Cenlar's payoff statement was wired to Cenlar on October 5, 2021.

325.  In an email dated October 6, 2021, Cenlar sent Plaintiffs a receipt that understated the amount that had actually been wired to Cenlar for the payoff.

326.  Cenlar's October 6, 2021, email failed to reflect that the payment Cenlar had received included amounts for the unexplained and erroneous "Corporate Advance" charge in the amount of $2,341.25, plus a $46.00 recording fee.

327.  Cenlar's apparent contention its October 6, 2021, email that Plaintiffs had not paid everything that Cenlar had claimed was due caused Plaintiffs substantial additional distress.

328.  In a letter dated November 3, 2021, Cenlar ostensibly responded to Plaintiffs' September 2021 Notice of Error.

329.  With its November 3, 2021, "response," Cenlar included a "Loan History" that showed that Plaintiffs had been charged for "MISC FORECLOSURE AND BANKRUPTCY EXPENSES," including on repeated occasions even after the loan modification had been approved and the foreclosure sale cancelled.

330.   Cenlar refused to respond to the substance of Plaintiffs' Notice of Error regarding the inflated Unpaid Principal Balance:  Cenlar stated, "As for whether or not the unpaid principal balance contains attorney's fees and other foreclosure fees that you believe are improper we cannot comment due to the pending litigation."

331.   As a result of Defendants' actions and omissions on and after July 1, 2021, Plaintiffs have suffered additional actual damages, including without limitation out-of-pocket expenses and emotional distress.


**TRIAL BY JURY**

332.   Plaintiffs are entitled to and hereby request a trial by jury.


**CAUSES OF ACTION**

**COUNT I**
**12 C.F.R. § 1024.41(c)**
**FAILURE TO DETERMINE LOSS MITIGATION OPTIONS,**
**CITIMORTGAGE**

333.   Defendant CitiMortgage violated 12 C.F.R. § 1024.41(c) in multiple ways, including without limitation by failing within 30 days of receiving Plaintiffs' completed loss mitigation applications to provide Plaintiffs with notice in writing stating CitiMortgage's determination of which loss mitigation options, if any, CitiMortgage would offer to Plaintiffs.

334.   As a result of CitiMortgage's violations of § 1024.41(c), Plaintiffs have suffered actual damages, including without limitation out-of-pocket expenses and

emotional distress.  Plaintiffs are therefore entitled to recover actual damages pursuant to 12 U.S.C. § 2605(f)(1)(A).

335.  CitiMortgage engaged in a pattern and practice of noncompliance, rendering it liable for statutory damages in the amount of $2,000 for each such failure to comply, pursuant to 12 U.S.C. § 2605(f)(1)(B).

336.  Defendant CitiMortgage is liable for Plaintiffs' costs and attorney's fees, pursuant to 12 U.S.C. § 2605(f)(3).

337.  CitiMortgage's violations of § 1024.41(c) also constitute violations of Minn. Stat. § 58.13, Subd. 1(8), which applies to "violat[ions of] any provision of any other applicable state or federal law regulating residential mortgage loans."

338.  CitiMortgage is liable for statutory damages pursuant to Minn. Stat. § 58.18.

339.  CitiMortgage is liable for punitive damages pursuant to Minn. Stat. § 58.18, Subd. 1(2).

340.  Plaintiffs are entitled to recover costs and attorney's fees from CitiMortgage pursuant to Minn. Stat. § 58.18.

### COUNT II
### MINN. STAT. § 582.043, SUBD. 5
### FAILURE TO DETERMINE LOSS MITIGATION OPTIONS, CITIMORTGAGE

341.  Defendant CitiMortgage violated Minn. Stat. § 582.043, Subd. 5 in multiple ways including without limitation by failing to notify Plaintiffs in writing of available loss mitigation options, failing to exercise reasonable diligence, failing to evaluate

Plaintiffs' loss mitigation application, and failure to offer loss mitigation options for which Plaintiffs were eligible.

342. As a result of CitiMortgage's violations of § 582.043, Subd. 5, Plaintiffs have suffered actual damages, including without limitation out-of-pocket expenses and emotional distress.

343. Defendant CitiMortgage is liable for Plaintiffs' costs and attorney's fees, pursuant to Minn. Stat. § 582.043, Subd. 7(a).

344. CitiMortgage's violations of § 582.043, Subd. 5 also constitute violations of Minn. Stat. § 58.13, Subd. 1(8), which applies to "violat[ions of] any provision of any other applicable state or federal law regulating residential mortgage loans."

345. CitiMortgage is liable for statutory damages pursuant to Minn. Stat. § 58.18.

346. CitiMortgage is liable for punitive damages pursuant to Minn. Stat. § 58.18, Subd. 1(2).

347. Plaintiffs are entitled to recover costs and attorney's fees from CitiMortgage pursuant to Minn. Stat. § 58.18.


## COUNT III
## 12 C.F.R. § 1024.41(f)(2)
## FORECLOSURE REFERRAL
## WITHOUT ACTING ON LOSS MITIGATION APPLICATION,
## CITIMORTGAGE

348. Defendant CitiMortgage violated 12 C.F.R. § 1024.41(f)(2) in multiple ways, including without limitation by referring Plaintiffs' account to a foreclosure attorney and, through that attorney, serving on Plaintiffs the first notice for non-

judicial foreclosure, after CitiMortgage had received Plaintiffs' completed loss

mitigation application, and without either denying Plaintiffs' application or

offering any loss mitigation option.

349.   As a result of CitiMortgage's violations of § 1024.41(f)(2), Plaintiffs have suffered

actual damages, including without limitation out-of-pocket expenses and

emotional distress.  Plaintiffs are therefore entitled to recover actual damages

pursuant to 12 U.S.C. § 2605(f)(1)(A).

350.   CitiMortgage engaged in a pattern and practice of noncompliance, rendering it liable

for statutory damages in the amount of $2,000 for each such failure to comply,

pursuant to 12 U.S.C. § 2605(f)(1)(B).

351.   Defendant CitiMortgage is liable for Plaintiffs' costs and attorney's fees, pursuant

to 12 U.S.C. § 2605(f)(3).

352.   CitiMortgage's violations of § 1024.41(f)(2) also constitute violations of Minn.

Stat. § 58.13, Subd. 1(8), which applies to "violat[ions of] any provision of any

other applicable state or federal law regulating residential mortgage loans."

353.   CitiMortgage is liable for statutory damages pursuant to Minn. Stat. § 58.18.

354.   CitiMortgage is liable for punitive damages pursuant to Minn. Stat. § 58.18, Subd.

1(2).

355.   Plaintiffs are entitled to recover costs and attorney's fees from CitiMortgage

pursuant to Minn. Stat. § 58.18.

## COUNT IV
## MINN. STAT. § 582.043, SUBD. 6
## DUAL TRACKING,
## CITIMORTGAGE

356.   Defendant CitiMortgage violated Minn. Stat. § 582.043, Subd. 6 in multiple ways,

including without limitation by referring Plaintiffs' account to a foreclosure

attorney and, through that attorney, serving on Plaintiffs the first notice for non-

judicial foreclosure, after CitiMortgage had received Plaintiffs' completed loss

mitigation application, and without either denying Plaintiffs' application or

offering any loss mitigation option.

357.   As a result of CitiMortgage's violations of § 582.043, Subd. 6, Plaintiffs have

suffered actual damages, including without limitation out-of-pocket expenses and

emotional distress.

358.   Defendant CitiMortgage is liable for Plaintiffs' costs and attorney's fees, pursuant

to Minn. Stat. § 582.043, Subd. 7(a).

359.   CitiMortgage's violations of § 582.043, Subd. 6 also constitute violations of Minn.

Stat. § 58.13, Subd. 1(8), which applies to "violat[ions of] any provision of any

other applicable state or federal law regulating residential mortgage loans."

360.   CitiMortgage is liable for statutory damages pursuant to Minn. Stat. § 58.18.

361.   CitiMortgage is liable for punitive damages pursuant to Minn. Stat. § 58.18, Subd.

1(2).

362.   Plaintiffs are entitled to recover costs and attorney's fees from CitiMortgage

pursuant to Minn. Stat. § 58.18.

**COUNT V**
**12 C.F.R. § 1024.41(b)(2)**
**FAILURE TO PROVIDE COMPLIANT NOTICE OF INCOMPLETE**
**APPLICATION AND HOW TO MAKE IT COMPLETE,**
**CITIMORTGAGE**

363.   Defendant CitiMortgage violated 12 C.F.R. § 1024.41(b)(2) in multiple ways,

including without limitation by failing to specify the additional documents or

information Plaintiffs supposedly needed to submit to make their loss mitigation

application complete and failing to state the date by which Plaintiffs should submit

such documents or information.

364.   As a result of CitiMortgage's violations of § 1024.41(b)(2), Plaintiffs have

suffered actual damages, including without limitation out-of-pocket expenses and

emotional distress.  Plaintiffs are therefore entitled to recover actual damages

pursuant to 12 U.S.C. § 2605(f)(1)(A).

365.   CitiMortgage engaged in a pattern and practice of noncompliance, rendering it liable

for statutory damages in the amount of $2,000 for each such failure to comply,

pursuant to 12 U.S.C. § 2605(f)(1)(B).

366.   Defendant CitiMortgage is liable for Plaintiffs' costs and attorney's fees, pursuant

to 12 U.S.C. § 2605(f)(3).

367.   CitiMortgage's violations of § 1024.41(b)(2) also constitute violations of Minn.

Stat. § 58.13, Subd. 1(8), which applies to "violat[ions of] any provision of any

other applicable state or federal law regulating residential mortgage loans."

368.   CitiMortgage is liable for statutory damages pursuant to Minn. Stat. § 58.18.

369. CitiMortgage is liable for punitive damages pursuant to Minn. Stat. § 58.18, Subd.

1(2).

370. Plaintiffs are entitled to recover costs and attorney's fees from CitiMortgage

pursuant to Minn. Stat. § 58.18.


**COUNT VI**
**MINN. STAT. § 58.13**
**VIOLATIONS OF THE MINNESOTA RESIDENTIAL MORTGAGE**
**ORIGINATOR AND SERVICER LICENSING ACT,**
**CITIMORTGAGE**

371. Defendant CitiMortgage violated Minn. Stat. § 58.13 in multiple ways including

without limitation by:  unreasonably delaying the processing of Plaintiffs'

mortgage loan applications; failing to perform in conformance with its written

agreements with investors, other licensees, or exempt persons; violating the state

and federal laws regulating residential mortgage loans identified elsewhere in this

Complaint; and making false and misleading statements in connection with

Plaintiff's loan modification, including misleadingly threatening foreclosure when

CitiMortgage was not legally entitled to foreclose and falsely representing whether

CitiMortgage had all the necessary information and documentation.

372. As a result of CitiMortgage's violation(s) of § 58.13, Plaintiffs have suffered

actual damages not limited to out-of-pocket expenses and emotional distress.

Plaintiffs are therefore entitled to recover actual damages under Minn. Stat. §

58.18.

373. CitiMortgage is liable for statutory damages pursuant to Minn. Stat. § 58.18.

374. CitiMortgage is liable for punitive damages pursuant to Minn. Stat. § 58.18, Subd. 1(2).

375. Plaintiffs are entitled to recover costs and attorney's fees from CitiMortgage pursuant to Minn. Stat. § 58.18.

## COUNT VII
## 12 C.F.R. § 1024.41(c)
## FAILURE TO DETERMINE LOSS MITIGATION OPTIONS,
## CENLAR FOR ITS OWN CONDUCT
## AND CITIMORTGAGE FOR THE CONDUCT OF ITS AGENT

376. Defendant Cenlar violated 12 C.F.R. § 1024.41(c) in multiple ways, including without limitation by failing within 30 days of receiving Plaintiffs' completed loss mitigation applications to provide Plaintiffs with notice in writing stating Cenlar's determination of which loss mitigation options, if any, Cenlar would offer to Plaintiffs.

377. As a result of Cenlar's violations of § 1024.41(c), Plaintiffs have suffered actual damages, including without limitation out-of-pocket expenses and emotional distress. Plaintiffs are therefore entitled to recover actual damages pursuant to 12 U.S.C. § 2605(f)(1)(A).

378. Cenlar engaged in a pattern and practice of noncompliance, rendering it liable for statutory damages in the amount of $2,000 for each such failure to comply, pursuant to 12 U.S.C. § 2605(f)(1)(B).

379. Defendant Cenlar is liable for Plaintiffs' costs and attorney's fees, pursuant to 12 U.S.C. § 2605(f)(3).

380.   Cenlar's violations of § 1024.41(c) also constitute violations of Minn. Stat. §

58.13, Subd. 1(8), which applies to "violat[ions of] any provision of any other

applicable state or federal law regulating residential mortgage loans."

381.   Cenlar is liable for statutory damages pursuant to Minn. Stat. § 58.18.

382.   Cenlar is liable for punitive damages pursuant to Minn. Stat. § 58.18, Subd. 1(2).

383.   Plaintiffs are entitled to recover costs and attorney's fees from Cenlar pursuant to

Minn. Stat. § 58.18.

384.   CitiMortgage is liable for Cenlar's conduct because Cenlar acted with

CitiMortgage's actual authority; CitiMortgage was negligent in selecting,

supervising, and otherwise controlling Cenlar; and Cenlar acted with

CitiMortgage's apparent authority.


**COUNT VIII**
**MINN. STAT. § 582.043, SUBD. 5**
**FAILURE TO DETERMINE LOSS MITIGATION OPTIONS,**
**CENLAR FOR ITS OWN CONDUCT**
**AND CITIMORTGAGE FOR THE CONDUCT OF ITS AGENT**

385.   Defendant Cenlar violated Minn. Stat. § 582.043, Subd. 5 in multiple ways

including without limitation by failing to notify Plaintiffs in writing of available

loss mitigation options, failing to exercise reasonable diligence, failing to evaluate

Plaintiffs' loss mitigation application, and failure to offer loss mitigation options

for which Plaintiffs were eligible.

386.   As a result of Cenlar's violations of § 582.043, Subd. 5, Plaintiffs have suffered actual damages, including without limitation out-of-pocket expenses and emotional distress.

387.   Defendant Cenlar is liable for Plaintiffs' costs and attorney's fees, pursuant to Minn. Stat. § 582.043, Subd. 7(a).

388.   Cenlar's violations of § 582.043, Subd. 5 also constitute violations of Minn. Stat. § 58.13, Subd. 1(8), which applies to "violat[ions of] any provision of any other applicable state or federal law regulating residential mortgage loans."

389.   Cenlar is liable for statutory damages pursuant to Minn. Stat. § 58.18.

390.   Cenlar is liable for punitive damages pursuant to Minn. Stat. § 58.18, Subd. 1(2).

391.   Plaintiffs are entitled to recover costs and attorney's fees from Cenlar pursuant to Minn. Stat. § 58.18.

392.   CitiMortgage is liable for Cenlar's conduct because Cenlar acted with CitiMortgage's actual authority; CitiMortgage was negligent in selecting, supervising, and otherwise controlling Cenlar; and Cenlar acted with CitiMortgage's apparent authority.

**COUNT IX**
**12 C.F.R. § 1024.41(f)(2)**
**FORECLOSURE REFERRAL**
**WITHOUT ACTING ON LOSS MITIGATION APPLICATION,**
**CENLAR FOR ITS OWN CONDUCT**
**AND CITIMORTGAGE FOR THE CONDUCT OF ITS AGENT**

393.   Defendant Cenlar violated 12 C.F.R. § 1024.41(f)(2) in multiple ways, including without limitation by referring Plaintiffs' account to a foreclosure attorney and,

52

through that attorney, serving on Plaintiffs the first notice for non-judicial foreclosure, after Cenlar had received Plaintiffs' completed loss mitigation application, and without either denying Plaintiffs' application or offering any loss mitigation option.

394. As a result of Cenlar's violations of § 1024.41(f)(2), Plaintiffs have suffered actual damages, including without limitation out-of-pocket expenses and emotional distress. Plaintiffs are therefore entitled to recover actual damages pursuant to 12 U.S.C. § 2605(f)(1)(A).

395. Cenlar engaged in a pattern and practice of noncompliance, rendering it liable for statutory damages in the amount of $2,000 for each such failure to comply, pursuant to 12 U.S.C. § 2605(f)(1)(B).

396. Defendant Cenlar is liable for Plaintiffs' costs and attorney's fees, pursuant to 12 U.S.C. § 2605(f)(3).

397. Cenlar's violations of § 1024.41(f)(2) also constitute violations of Minn. Stat. § 58.13, Subd. 1(8), which applies to "violat[ions of] any provision of any other applicable state or federal law regulating residential mortgage loans."

398. Cenlar is liable for statutory damages pursuant to Minn. Stat. § 58.18.

399. Cenlar is liable for punitive damages pursuant to Minn. Stat. § 58.18, Subd. 1(2).

400. Plaintiffs are entitled to recover costs and attorney's fees from Cenlar pursuant to Minn. Stat. § 58.18.

401. CitiMortgage is liable for Cenlar's conduct because Cenlar acted with CitiMortgage's actual authority; CitiMortgage was negligent in selecting,

supervising, and otherwise controlling Cenlar; and Cenlar acted with

CitiMortgage's apparent authority.


**COUNT X**
**MINN. STAT. § 582.043**
**LOSS MITIGATION PROCEDURES AND DUAL TRACKING,**
**CENLAR FOR ITS OWN CONDUCT**
**AND CITIMORTGAGE FOR THE CONDUCT OF ITS AGENT**

402.  Defendant Cenlar violated Minn. Stat. § 582.043, Subds. 5 and 6 in multiple ways,

including without limitation by failing to give Plaintiffs a reasonable  amount of

time to provide documents; and by referring Plaintiffs' account to a foreclosure

attorney and, through that attorney, serving on Plaintiffs the first notice for non-

judicial foreclosure, after Cenlar had received Plaintiffs' completed loss mitigation

application, and without either denying Plaintiffs' application or offering any loss

mitigation option.

403.  As a result of Cenlar's violations of § 582.043, Subds. 5 and 6, Plaintiffs have

suffered actual damages, including without limitation out-of-pocket expenses and

emotional distress.

404.  Defendant Cenlar is liable for Plaintiffs' costs and attorney's fees, pursuant to

Minn. Stat. § 582.043, Subd. 7(a).

405.  Cenlar's violations of § 582.043, Subds. 5 and 6 also constitute violations of

Minn. Stat. § 58.13, Subd. 1(8), which applies to "violat[ions of] any provision of

any other applicable state or federal law regulating residential mortgage loans."

406.  Cenlar is liable for statutory damages pursuant to Minn. Stat. § 58.18.

407.   Cenlar is liable for punitive damages pursuant to Minn. Stat. § 58.18, Subd. 1(2).

408.   Plaintiffs are entitled to recover costs and attorney's fees from Cenlar pursuant to

Minn. Stat. § 58.18.

409.   CitiMortgage is liable for Cenlar's conduct because Cenlar acted with

CitiMortgage's actual authority; CitiMortgage was negligent in selecting,

supervising, and otherwise controlling Cenlar; and Cenlar acted with

CitiMortgage's apparent authority.

**COUNT XI**
**12 C.F.R. § 1024.41(b)(2)**
**FAILURE TO PROVIDE COMPLIANT NOTICE OF INCOMPLETE**
**APPLICATION AND HOW TO MAKE IT COMPLETE,**
**CENLAR FOR ITS OWN CONDUCT**
**AND CITIMORTGAGE FOR THE CONDUCT OF ITS AGENT**

410.   Defendant Cenlar violated 12 C.F.R. § 1024.41(b)(2) in multiple ways, including

without limitation by failing to specify the additional documents or information

Plaintiffs supposedly needed to submit to make their loss mitigation application

complete and failing to state the date by which Plaintiffs should submit such

documents or information.

411.   As a result of Cenlar's violations of § 1024.41(b)(2), Plaintiffs have suffered

actual damages, including without limitation out-of-pocket expenses and

emotional distress.  Plaintiffs are therefore entitled to recover actual damages

pursuant to 12 U.S.C. § 2605(f)(1)(A).

412.   Cenlar engaged in a pattern and practice of noncompliance, rendering it liable for statutory damages in the amount of $2,000 for each such failure to comply, pursuant to 12 U.S.C. § 2605(f)(1)(B).

413.   Defendant Cenlar is liable for Plaintiffs' costs and attorney's fees, pursuant to 12 U.S.C. § 2605(f)(3).

414.   Cenlar's violations of § 1024.41(b)(2) also constitute violations of Minn. Stat. § 58.13, Subd. 1(8), which applies to "violat[ions of] any provision of any other applicable state or federal law regulating residential mortgage loans."

415.   Cenlar is liable for statutory damages pursuant to Minn. Stat. § 58.18.

416.   Cenlar is liable for punitive damages pursuant to Minn. Stat. § 58.18, Subd. 1(2).

417.   Plaintiffs are entitled to recover costs and attorney's fees from Cenlar pursuant to Minn. Stat. § 58.18.

418.   CitiMortgage is liable for Cenlar's conduct because Cenlar acted with CitiMortgage's actual authority; CitiMortgage was negligent in selecting, supervising, and otherwise controlling Cenlar; and Cenlar acted with CitiMortgage's apparent authority.


**COUNT XII**
**MINN. STAT. § 58.13**
**VIOLATIONS OF THE MINNESOTA RESIDENTIAL MORTGAGE**
**ORIGINATOR AND SERVICER LICENSING ACT,**
**CENLAR FOR ITS OWN CONDUCT**
**AND CITIMORTGAGE FOR THE CONDUCT OF ITS AGENT**

419.    Defendant Cenlar violated Minn. Stat. § 58.13 in multiple ways including without limitation by:  unreasonably delaying the processing of Plaintiffs' mortgage loan applications and the closing of the modification loan; violating the state and federal laws regulating residential mortgage loans identified elsewhere in this Complaint; and making false and misleading statements in connection with Plaintiff's loan modification, including misleadingly threatening foreclosure when Cenlar was not legally entitled to foreclose, placing misleading notices of foreclosure sale in the newspaper, causing misleading indications of foreclosure to be published on foreclosure.com and Zillow, falsely representing whether Cenlar had all the necessary information and documentation, falsely backdating correspondence, issuing false billing statements, inaccurately showing multiple late payments on the account on Cenlar's website, issuing an inaccurate payoff statement, providing an inaccurate receipt for the payoff payment Plaintiffs made, and inaccurately stating that Plaintiffs incurred charges  for "MISC FORECLOSURE AND BANKRUPTCY EXPENSES" even after the loan modification had been approved and the foreclosure sale cancelled.

420.    As a result of Cenlar's violation(s) of § 58.13, Plaintiffs have suffered actual damages not limited to out-of-pocket expenses and emotional distress.  Plaintiffs are therefore entitled to recover actual damages under Minn. Stat. § 58.18.

421.    Cenlar is liable for statutory damages pursuant to Minn. Stat. § 58.18.

422.    Cenlar is liable for punitive damages pursuant to Minn. Stat. § 58.18, Subd. 1(2).

423. Plaintiffs are entitled to recover costs and attorney's fees from Cenlar pursuant to Minn. Stat. § 58.18.

424. CitiMortgage is liable for Cenlar's conduct because Cenlar acted with CitiMortgage's actual authority; CitiMortgage was negligent in selecting, supervising, and otherwise controlling Cenlar; and Cenlar acted with CitiMortgage's apparent authority.

## COUNT XIII
## BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING, CITIMORTGAGE AND CENLAR

425. Defendants CitiMortgage and Cenlar unjustifiably hindered Plaintiffs from performing under the original mortgage loan agreement by refusing to accept payments from Plaintiffs while they were in the modification process and at the same time failing to act on Plaintiffs' modification application.

426. Due to CitiMortgage's and Cenlar's breaches of their duty of good faith and fair dealing, Plaintiffs incurred unwarranted late fees and other fees.

427. Due to their breach of the duty of good faith and fair dealing, Defendants are legally precluded from enforcing the original mortgage loan agreement via foreclosure.

## COUNT XV
## VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT
## 15 U.S.C. §§ 1692c(a)(2), 1692e, 1692e(2), 1692e(5), 1692f(1), and 1692f(6), CENLAR

428.   Cenlar's foregoing actions and omissions in connection with its attempts to collect the debt violated numerous and multiple provisions of the FDCPA, including without limitation 15 U.S.C. §§ 1692c(a)(2), 1692e, 1692e(2), 1692e(5), 1692f(1), and 1692f(6).

429.   As a result of Cenlar's violations of the FDCPA, Plaintiff has suffered actual damages not limited to out-of-pocket expenses and emotional distress.  Plaintiff is therefore entitled to recover actual damages under 15 U.S.C. § 1692k.

430.   Under 15 U.S.C. § 1692k, Plaintiff is also entitled to recover from Cenlar $1,000 in statutory damages and reasonable attorney's fees and costs.

431.   Cenlar's violations of the FDCPA also constitute violations of Minn. Stat. § 58.13, Subd. 1(8), which applies to "violat[ions of] any provision of any other applicable state or federal law regulating residential mortgage loans."

432.   Cenlar is liable for statutory damages pursuant to Minn. Stat. § 58.18.

433.   Cenlar is liable for punitive damages pursuant to Minn. Stat. § 58.18, Subd. 1(2).

434.   Plaintiffs are entitled to recover costs and attorney's fees from Cenlar pursuant to Minn. Stat. § 58.18.


**COUNT XVI**
**VIOLATION OF THE FAIR DEBT COLLECTION PRACTICES ACT**
**15 U.S.C. § 1692f(6),**
**CENLAR FOR THE CONDUCT OF ITS AGENT**

435.   Usset's foregoing actions and omissions in connection with its attempts to collect the debt violated the FDCPA, specifically 15 U.S.C. § 1692f(6).

436.   As a result of Usset's violations of the FDCPA, Plaintiff has suffered actual
       damages not limited to out-of-pocket expenses and emotional distress.  Plaintiff is
       therefore entitled to recover actual damages under 15 U.S.C. § 1692k.

437.   Usset's violations of the FDCPA also constitute violations of Minn. Stat. § 58.13,
       Subd. 1(8), which applies to "violat[ions of] any provision of any other applicable
       state or federal law regulating residential mortgage loans."

438.   Cenlar is liable for Usset's conduct because Usset acted with Cenlar's actual
       authority; Cenlar was negligent in selecting, supervising, and otherwise controlling
       Usset; and Usset acted with Cenlar's apparent authority.


**COUNT XVII**
**12 C.F.R. § 1024.35**
**FAILURE TO COMPLY WITH REGULATION X**
**ERROR RESOLUTION PROCEDURES,**
**CENLAR FOR ITS OWN CONDUCT**
**AND CITIMORTGAGE FOR THE CONDUCT OF ITS AGENT**

439.   Defendant Cenlar violated 12 C.F.R. § 1024.35 in multiple ways, including
       without limitation by failing within 30 business days of receiving Plaintiffs'
       October 2020 Notice of Error to either correct the errors or conduct a reasonable
       investigation and provide Plaintiffs with a written notification including a
       statement that Cenlar determined that no error occurred and a statement of the
       reason or reasons for that determination; by failing within 7 business days to
       respond to Plaintiffs' September 2021 Notice of Error regarding failure to provide
       an accurate payoff balance amount; and by refusing to respond to the substance of

Plaintiffs' September 2021 Notice of Error regarding the inflated Unpaid Principal Balance.

440.   As a result of Cenlar's violations of § 1024.35, Plaintiffs have suffered actual damages, including without limitation out-of-pocket expenses and emotional distress.  Plaintiffs are therefore entitled to recover actual damages pursuant to 12 U.S.C. § 2605(f)(1)(A).

441.   Cenlar engaged in a pattern and practice of noncompliance, rendering it liable for statutory damages in the amount of $2,000 for each such failure to comply, pursuant to 12 U.S.C. § 2605(f)(1)(B).

442.   Defendant Cenlar is liable for Plaintiffs' costs and attorney's fees, pursuant to 12 U.S.C. § 2605(f)(3).

443.   Cenlar's violations of § 1024.35 also constitute violations of Minn. Stat. § 58.13, Subd. 1(8), which applies to "violat[ions of] any provision of any other applicable state or federal law regulating residential mortgage loans."

444.   Cenlar is liable for statutory damages pursuant to Minn. Stat. § 58.18.

445.   Cenlar is liable for punitive damages pursuant to Minn. Stat. § 58.18, Subd. 1(2).

446.   Plaintiffs are entitled to recover costs and attorney's fees from Cenlar pursuant to Minn. Stat. § 58.18.

447.   CitiMortgage is liable for Cenlar's conduct because Cenlar acted with CitiMortgage's actual authority; CitiMortgage was negligent in selecting, supervising, and otherwise controlling Cenlar; and Cenlar acted with CitiMortgage's apparent authority.

## COUNT XVIII
## 12 C.F.R. § 1024.36
## FAILURE TO COMPLY WITH REGULATION X
## REQUESTS FOR INFORMATION,
## CENLAR FOR ITS OWN CONDUCT
## AND CITIMORTGAGE FOR THE CONDUCT OF ITS AGENT

448. Defendant Cenlar violated 12 C.F.R. § 1024.36 in multiple ways, including without limitation by failing within 30 business days of receiving Plaintiffs' Request for Information to either provide all of the information, provide notice to Plaintiffs that the information was not available to Cenlar, or provide notice to Plaintiffs that Cenlar had determined that it was not required to provide all the information; and by failing to provide an accurate payoff statement.

449. As a result of Cenlar's violations of § 1024.36, Plaintiffs have suffered actual damages, including without limitation out-of-pocket expenses and emotional distress. Plaintiffs are therefore entitled to recover actual damages pursuant to 12 U.S.C. § 2605(f)(1)(A).

450. Cenlar engaged in a pattern and practice of noncompliance, rendering it liable for statutory damages in the amount of $2,000 for each such failure to comply, pursuant to 12 U.S.C. § 2605(f)(1)(B).

451. Defendant Cenlar is liable for Plaintiffs' costs and attorney's fees, pursuant to 12 U.S.C. § 2605(f)(3).

452. Cenlar's violations of § 1024.36 also constitute violations of Minn. Stat. § 58.13, Subd. 1(8), which applies to "violat[ions of] any provision of any other applicable state or federal law regulating residential mortgage loans."

453. Cenlar is liable for statutory damages pursuant to Minn. Stat. § 58.18.

454. Cenlar is liable for punitive damages pursuant to Minn. Stat. § 58.18, Subd. 1(2).

455. Plaintiffs are entitled to recover costs and attorney's fees from Cenlar pursuant to Minn. Stat. § 58.18.

456. CitiMortgage is liable for Cenlar's conduct because Cenlar acted with CitiMortgage's actual authority; CitiMortgage was negligent in selecting, supervising, and otherwise controlling Cenlar; and Cenlar acted with CitiMortgage's apparent authority.

## COUNT XIX
## 12 C.F.R. § 1024.40
## FAILURE TO COMPLY WITH REGULATION X
## CONTINUITY OF CONTACT REQUIREMENTS,
## CITIMORTGAGE

457. Defendant CitiMortgage violated 12 C.F.R. § 1024.40 in multiple ways, including without limitation by failing to assign personnel to Plaintiffs to provide Plaintiffs with accurate information about available loss mitigation options, actions Plaintiffs were required to take, the status of Plaintiffs' loss mitigation applications, applicable loss mitigation deadlines, and the circumstances under which CitiMortgage might make a referral to foreclosure.

458.   As a result of CitiMortgage's violations of § 1024.40, Plaintiffs have suffered actual damages, including without limitation out-of-pocket expenses and emotional distress.

459.   CitiMortgage's violations of § 1024.40 constitute violations of Minn. Stat. § 58.13, Subd. 1(8), which applies to "violat[ions of] any provision of any other applicable state or federal law regulating residential mortgage loans."

460.   Plaintiffs are entitled to recover their actual damages pursuant to Minn. Stat. § 58.18.

461.   CitiMortgage is liable for statutory damages pursuant to Minn. Stat. § 58.18.

462.   CitiMortgage is liable for punitive damages pursuant to Minn. Stat. § 58.18, Subd. 1(2).

463.   Plaintiffs are entitled to recover costs and attorney's fees from CitiMortgage pursuant to Minn. Stat. § 58.18.

**COUNT XX**
**12 C.F.R. § 1024.40**
**FAILURE TO COMPLY WITH REGULATION X**
**CONTINUITY OF CONTACT REQUIREMENTS,**
**CENLAR FOR ITS OWN CONDUCT**
**AND CITIMORTGAGE FOR THE CONDUCT OF ITS AGENT**

464.   Defendant Cenlar violated 12 C.F.R. § 1024.40 in multiple ways, including without limitation by failing to assign personnel to Plaintiffs to provide Plaintiffs with accurate information about available loss mitigation options, actions Plaintiffs were required to take, the status of Plaintiffs' loss mitigation

applications, applicable loss mitigation deadlines, and the circumstances under which Cenlar might make a referral to foreclosure.

465.   As a result of Cenlar's violations of § 1024.40, Plaintiffs have suffered actual damages, including without limitation out-of-pocket expenses and emotional distress.

466.   Cenlar's violations of § 1024.40 constitute violations of Minn. Stat. § 58.13, Subd. 1(8), which applies to "violat[ions of] any provision of any other applicable state or federal law regulating residential mortgage loans."

467.   Plaintiffs are entitled to recover their actual damages pursuant to Minn. Stat. § 58.18.

468.   Cenlar is liable for statutory damages pursuant to Minn. Stat. § 58.18.

469.   Cenlar is liable for punitive damages pursuant to Minn. Stat. § 58.18, Subd. 1(2).

470.   Plaintiffs are entitled to recover costs and attorney's fees from Cenlar pursuant to Minn. Stat. § 58.18.

471.   CitiMortgage is liable for Cenlar's conduct because Cenlar acted with CitiMortgage's actual authority; CitiMortgage was negligent in selecting, supervising, and otherwise controlling Cenlar; and Cenlar acted with CitiMortgage's apparent authority.

**COUNT XXIV**
**UNJUST ENRICHMENT**
**CITIMORTGAGE AND CENLAR**

472.   Plaintiffs made payments based on the inflated Unpaid Principal Balance.

473.   The Unpaid Principal Balance was inflated for reasons including that it included wrongful attorney's fees and other foreclosure expenses that had been capitalized.

474.   The attorney's fees and other foreclosure expenses were wrongful because they were incurred due to CitiMortgage's and Cenlar's improper referral to foreclosure attorneys and failure to recall the account from Usset even after Plaintiffs had been approved for the loan modification.

475.   A benefit was conferred on Defendants from the fees wrongfully billed to Plaintiffs and Plaintiffs' payments on the inflated Unpaid Principal Balance.

476.   Defendants' retention of the benefit is not legally justifiable.

477.   The foregoing constitutes unjust enrichment.

478.   Defendants' conduct showed deliberate disregard for the rights of Plaintiffs, rendering Defendants liable for punitive damages pursuant to Minn. Stat. §§ 549.191, and 549.20.

**WHEREFORE,**

Plaintiffs pray that judgment be entered against these Defendants for:

   a.) Plaintiff's actual damages, including unliquidated damages in an amount greater than $50,000;

b.) Statutory damages pursuant to 12 U.S.C. § 2605(f)(1)(B),  Minn. Stat. § 58.18, and 15 U.S.C. § 1692k(a)(2);

c.) Reasonable attorney's fees and costs pursuant to 12 U.S.C. § 2605(f)(3); Minn. Stat. § 582.043, Subd. 7(a); Minn. Stat. § 58.18; and 15 U.S.C. § 1692k(a)(3);

d.) Punitive damages pursuant to Minn. Stat. § 58.18, subd. 1(2);

e.) Punitive damages pursuant to Minn. Stat. §§ 549.191, and 549.20; and

f.) Such other and further relief as may be just and proper.

Dated:  _____12/5/22                    **GOOLSBY LAW OFFICE, LLC**

By:  _____s/John H. Goolsby____
John H. Goolsby, #0320201
475 Cleveland Ave. N, Suite 212
Saint Paul, MN 55104
Telephone:  (651) 646-0153
jgoolsby@goolsbylawoffice.com
**Attorney for Plaintiffs**